# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00661-CV

---

**J. B. M. H. and Y. C. B., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 274TH DISTRICT COURT OF HAYS COUNTY
### NO. 21-0825, THE HONORABLE JOHN FRANKLIN PHILLIPS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellants J.B.M.H. (Father) and Y.C.B. (Mother) appeal from the district court's order, following a bench trial, terminating their parental rights to their children, six-year-old D.C. (Daughter 1), three-year-old S.C. (Daughter 2), and two-year-old B.C. (Son).[1] In two issues on appeal for Father and three issues on appeal for Mother, each parent challenges the legal and factual sufficiency of the evidence supporting the district court's findings that they endangered the children and that termination of their parental rights was in the best interest of the children. We will affirm the district court's order of termination.

---

[1] Daughter 1 is Mother's child with another man, P.M., whose parental rights were also terminated in the proceedings below but who did not appear for trial and who has not filed a notice of appeal, while Daughter 2 and Son are Mother's children with Father. For the children's privacy, we refer to them and their parents by their initials and by their familial relationships to each other, and we refer to the children's approximate ages at the time of trial. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

**BACKGROUND**

In March 2021, the Texas Department of Family and Protective Services (the Department) received a report that Daughter 2 had been injured in a vehicle accident. According to the Department's removal affidavit,[2] on March 29, 2021, Mother, Father, and Daughter 2 were involved in an automobile accident in which Father had been driving while intoxicated and Daughter 2 had been ejected from the vehicle after not being placed in a car seat, resulting in Daughter 2 suffering serious injuries.

Following an investigation in which the Department learned that Father and Mother had a history of driving while intoxicated, the Department sought and obtained emergency removal of the children from their parents and filed a petition to terminate Father's and Mother's parental rights. The Department also moved for a finding of aggravated circumstances, which the district court granted. *See* Tex. Fam. Code § 262.2015 (providing for waiver of requirements of service plan and reasonable efforts to return child to parent and for accelerated trial schedule if court finds that parent has subjected child to aggravated circumstances, which includes commission of certain criminal offenses such as aggravated assault).

The case proceeded to a four-day bench trial, at the conclusion of which the district court found by clear and convincing evidence that Father and Mother had: (1) knowingly placed or knowingly allowed the children to remain in conditions and surroundings which endangered their physical and emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical and

---

[2] A copy of the removal affidavit was not admitted into evidence during trial. We refer to the affidavit only to the extent necessary to understand the background of this case.

2

emotional well-being. *See id.* § 161.001(b)(1)(D), (E). The district court also found by clear and convincing evidence that termination of Father's and Mother's parental rights was in the best interest of the children. *See id.* § 161.001(b)(2). The district court later signed an order terminating Father's and Mother's parental rights. This appeal followed.

## STANDARD OF REVIEW

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of

3

parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the

4

constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id*.

## DISCUSSION

**Statutory grounds**

In Father's first issue and Mother's first and second issues, they argue that the evidence is legally and factually insufficient to support the district court's endangerment findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Father and Mother both argue that Father's drunk driving on the day of the collision was a single occurrence, not three separate occurrences as the Department contends, and that a single occurrence of drunk driving does not support a finding of endangerment under Subsection (E). Mother additionally argues that there was insufficient evidence to support a finding of endangerment under Subsection (D) because the Department did not prove that she knew that Father was drunk at the time of the collision.

### *Applicable law*

Endangerment means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99. A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. Moreover, when parents injure or harm one of their children, a factfinder may infer that the parents have endangered their other children. *See In re E.A.K.*, 192 S.W.3d 133, 151 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

5

Subsection (D) authorizes termination of parental rights if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). Subsection (E) authorizes termination of parental rights if clear and convincing evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. § 161.001(b)(1)(E). Although both grounds require proof of endangerment, they are otherwise separate and distinct grounds. *See A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso 2012, no pet.); *In re S.H.A.*, 728 S.W.2d 73, 85 (Tex. App.—Dallas 1987, writ ref'd n.r.e.); *see also In re J.K.N.G.*, No. 04-21-00310-CV, 2022 WL 689095, at *5 (Tex. App.—San Antonio Mar. 9, 2022, pet. denied) (mem. op.).

The primary distinction between subsections (D) and (E) is the cause of the endangerment to the child's physical or emotional well-being. *S.H.A.*, 728 S.W.2d at 85. Under subsection (D), the focus is on "conditions or surroundings" that endanger the child, while under subsection (E), the focus is on "conduct" that endangers the child. *Id*. Moreover, "[a] single act or omission can support termination under subsection (D)," *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.), while "termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required," *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied).

Also, subsection (D) always requires proof of scienter, i.e., evidence that parents "knowingly" placed or "knowingly" allowed their child to remain in endangering conditions or

6

surroundings. *See In re T.H.*, 131 S.W.3d 598, 603 (Tex. App.—Texarkana 2004, pet. denied); *cf. In re I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied) ("Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts."). "Subsection D is not a basis for terminating parental rights if the parent was unaware of the endangering environment." *In re A.L.H.*, 468 S.W.3d 738, 746 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "So, in scrutinizing the endangerment finding, we focus not only on evidence of endangerment but also on evidence showing the parent's awareness of the endangering environment." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

### Evidence presented

The accident occurred on US Highway 183 in Hays County. Fernando Martinez, who lived nearby, heard a "big old bang" from inside his house and ran outside to see what had happened. Martinez testified that when he arrived at the scene of the accident, he saw a woman "laying on the road with her baby." Martinez also noticed that the vehicle from which the woman and her child appeared to have been thrown was starting to catch fire, so he ran back to his house to get a fire extinguisher, and with the assistance of his wife and a neighbor, they were able to extinguish the fire. Martinez observed that the woman was bleeding badly, and he kept her calm until EMS arrived, while his wife took care of the baby.

Department of Public Safety Trooper Marcus Waechter responded to the accident. Waechter testified that when he arrived at the scene, he observed a Chevy pickup in the northbound lane of Highway 183 "with heavy front end damage." The Chevy had collided "head on" with a Ford pickup, which was "in the ditch." In the interior of the Chevy, underneath the

driver's side door mat, Waechter found an open beer can with a small amount of beer remaining inside. Father was reported to be the driver of the Chevy. Two of the three passengers inside the Chevy, Mother and Daughter 2, had been ejected from the vehicle.[3] All four occupants of the Chevy and the two occupants of the Ford had been transported to the hospital for treatment before Waechter's arrival on the scene. Thus, Waechter was unable to interview them about the crash. However, based on data obtained from the vehicles' computer systems, Waechter determined that at the time of the collision, the Chevy was traveling at a rate of 76 miles per hour and the Ford was traveling at a rate of 65 miles per hour. Also, a video camera outside a roadside taqueria recorded the crash, and video footage from that recording was admitted into evidence. Photographs showing the aftermath of the collision and a copy of Waechter's crash report were also admitted into evidence. Waechter testified that following the investigation into the collision, Father was arrested for driving while intoxicated.

Father's blood was drawn after the accident and was analyzed by DPS toxicologist Andrew Sheely, who testified that Father's blood alcohol content was .224, which Sheely considered to be "high." Sheely estimated that at the time of the collision, which occurred approximately one hour before Father's blood was drawn, his blood alcohol level could have been somewhere between .234 and .254. Sheely explained that at that level, one "would expect to see a more severe effect on one's motor skills and impairment," with "some sort of swaying" and "slurring of words." He added, "At this level it is very likely that there is at least some sort of visible intoxication present" that would be observed by others who were with that person.

---

[3] Father's brother was the third passenger inside the Chevy.

Dr. Patrick Combs, a pediatric plastic and craniofacial surgeon at Dell Children's Medical Center, was one of the doctors who treated Daughter 2 for her injuries. Dr. Combs testified that Daughter 2 had "multiple fractures in her skull," "a fracture to her nasal bone and frontal bone," and a "concealed mandible fracture" near her chin and cheek area. The nose fractures were "nondisplaced" and thus "did not require treatment." However, the skull fractures were "potentially life-threatening" in that they were associated with an "intracranial hemorrhage," i.e., a "brain bleed," and needed to be treated with a craniotomy. The mandible fracture, although not life-threatening, needed to be treated surgically to avoid possible disfigurement of Daughter 2's face and the possible impairment of her ability to chew.

Father admitted in his testimony that on the day of the collision, he drank alcohol and used cocaine before driving. The first place to which he drove while drunk was the home of his mother-in-law (Grandmother), and he admitted to drinking "about five" beers before driving there. Father testified that all three children were in the car with him when he drove to Grandmother's house. After leaving Grandmother's house, he then drove with Mother, Daughter 2, and his brother to a flea market, where he had an additional two beers. Approximately ten minutes after they left the flea market, the collision occurred. When shown a photo of the beer can that was found inside his truck, Father testified that he did not know how it got there. However, Father acknowledged that he caused the head-on collision with another vehicle after drinking at least seven alcoholic beverages that day, which Father testified was the amount of alcohol he drank "like every weekend." Father admitted that Daughter 2 was not in a car seat when the collision occurred and that as a result, "she was thrown out" of the vehicle and injured, as was Mother, who was not wearing a seat belt. Father testified that Mother was in the hospital for approximately two weeks while Daughter 2 was in the hospital for approximately one-and-a-

9

half weeks recovering from their injuries. Father recounted that following his arrest, he was found guilty of injuring Daughter 2 and the two occupants of the Ford, and he received a ten-year probated sentence for those offenses.

Father further testified that he had a prior conviction for driving while intoxicated that had also resulted in probation. As a condition of his probation, Father had to take a class concerning the dangers of driving while intoxicated, and he completed that class. Thus, Father acknowledged that he had been taught the dangers of driving while intoxicated but nevertheless consumed seven alcoholic beverages and then drove with Daughter 2 unrestrained in his truck. Father also testified that during his first arrest for driving while intoxicated, his wife was a passenger in his vehicle. Father admitted that on that occasion, he also had been drinking and using cocaine.

Mother's testimony took place over two days. On the first day of her testimony, Mother acknowledged that the collision occurred because Father had been drinking and driving, but she testified that she did not know until after the collision that Father had been drinking that day. She acknowledged that she had stated during the investigation that she "thought" Father had been drinking that day, but she testified "that was just a guess." She now "wasn't sure" whether Father "drank or not." Mother also testified that she had told Father's lawyer that Father "had three beers" before leaving the house that day because Father "had said that to [her]." Mother testified that while they were at the flea market, she "just saw that [Father] grabbed one" beer.

Mother also acknowledged that she knew it was dangerous to drink and drive, that it was dangerous to get in a vehicle with someone who had been drinking, and that on the day of the collision, she was responsible for taking care of Daughter 2 and had placed her in the truck

10

without a car seat. When asked why Daughter 2 was not placed in a car seat, Mother admitted that she and Father "made a bad decision" that day but thought that they would drop off Daughter 2 at Grandmother's house and thus that Daughter 2 would not be in the car for long.

Mother testified that she had been walking with Father at the flea market before they got into the vehicle and that she was near Father in the truck. However, when asked if Father "smelled like alcohol" at that time, Mother testified, "I don't remember." Mother also testified that she had been around Father in the past while he had been drinking, including when he had been arrested for his earlier DWI, but that she did not "know when he's intoxicated."

Mother acknowledged that she had been convicted of driving while intoxicated in 2019 for an offense that occurred in 2018 while she was pregnant with Daughter 2 and that at the time of the collision, she was still on probation for that offense. Mother testified that she does not drink anymore and that she stopped drinking after she "got [her] DWI." Before she stopped drinking, she could have "3 or 4" drinks in one sitting. As part of her probation, Mother attended a drinking and driving class where she learned that getting into a vehicle with someone who had been drinking and driving is dangerous "because of the way that alcohol affects people."

On the second day of her testimony, Mother testified, "I thought about it last night and I did know that [Father] was drunk, but I didn't know how drunk he was." Mother also admitted that she knew that Father drank often and that she was able to recognize signs that he had been drinking, but "only if he was very drunk."

*Analysis*

We will focus our analysis on Subsection (D), which concerns a child's placement in endangering conditions or surroundings. *See* Tex. Fam. Code § 161.001(b)(1)(D). Here, the

11

above evidence supports a finding by the district court that Father and Mother placed Daughter 2 in Father's vehicle, without a car seat, at a time when they knew that Father was driving while intoxicated. Father admitted that on the day of the collision, he drank alcohol and used cocaine before driving. More specifically, Father admitted to drinking "about five" beers before driving to Grandmother's house. All three children were in the car with Father at the time he drove there. Then, Father drove with Mother, his brother, and Daughter 2 to a flea market, where he consumed an additional two beers. The collision occurred after they left the flea market. When Father's blood was drawn approximately one hour after the collision, his blood alcohol level was .224, and DPS toxicologist Sheely estimated that at the time of the collision, Father's blood alcohol level could have been somewhere between .234 and .254.

Also, Father had a prior conviction for DWI, and as a condition of his probation for that offense, Father had been required to take a class concerning the dangers of driving while intoxicated. Father testified that he completed that class and acknowledged that he had been taught about the dangers of driving while intoxicated. From this evidence, the district court could have reasonably inferred that Father knew that placing Daughter 2 in his truck, while he was driving intoxicated, would endanger Daughter 2's physical well-being, particularly considering that she was not in a car seat at the time.

As for evidence of Mother's knowledge that Father was driving while intoxicated, although she initially denied knowing that Father was intoxicated at the time of the collision, she admitted on the second day of her testimony that she "did know that [Father] was drunk" that day, even though she "didn't know how drunk he was," and she further admitted that she knew that Father drank often and that she was able to recognize signs that he had been drinking, although "only if he was very drunk." Additionally, Sheely testified that at Father's level of

12

intoxication, one "would expect to see a more severe effect on one's motor skills and impairment," with "some sort of swaying" and "slurring of words," and that it was "very likely that there is at least some sort of visible intoxication present" that would be observed by others who were with that person. Also, Mother had been present with Father when he previously had been arrested for driving while intoxicated. From this evidence, the district court could have reasonably inferred that Mother was aware that Father was intoxicated at the time she placed Daughter 2 in Father's vehicle.

Further, Mother herself had a prior conviction for driving while intoxicated and testified that as a condition of her probation for that offense, she attended a drinking and driving class where she learned that getting into a vehicle with someone who had been drinking and driving is dangerous "because of the way that alcohol affects people." Thus, the district court could have reasonably inferred that Mother, like Father, knew that placing Daughter 2 in Father's vehicle when Father was intoxicated would endanger Daughter.

Moreover, the endangerment in this case was not hypothetical. The collision, which ejected Daughter 2 from the vehicle because she was not in a car seat, resulted in serious injuries to Daughter 2, including "multiple fractures in her skull," "a fracture to her nasal bone and frontal bone," and a "concealed mandible fracture" near her chin and cheek area. The skull fractures were "potentially life-threatening" in that they were associated with a "brain bleed" and needed to be treated with a craniotomy, while the mandible fracture also required surgery to avoid possible disfigurement of Daughter 2's face and the possible impairment of her ability to chew. Father testified that Daughter 2 was in the hospital for approximately one-and-a-half weeks recovering from her injuries. Additionally, although only Daughter 2 suffered actual injury from her placement in Father's vehicle that day, the district court could have reasonably

13

inferred that the other children were also placed in similar danger when Father and Mother drove with the children to Grandmother's house after Father had consumed "about five" beers. *See In re E.A.K.*, 192 S.W.3d at 151 (explaining that "trier of fact may infer endangerment to one child from actual harm caused to another child").

We conclude that the evidence is legally and factually sufficient to support a finding that Father and Mother knowingly placed the children in conditions or surroundings which endangered their physical or emotional well-being so as to support a finding of endangerment under Subsection (D). *See In re A.R.G.*, No. 04-19-00749-CV, 2020 WL 1277739, at *3 (Tex. App.—San Antonio Mar. 18, 2020, no pet.) (mem. op.) (concluding that evidence showing that "Mother drove with her children in her car while under the influence of methamphetamine support[ed] the trial court's finding that the children were endangered, thereby jeopardizing their safety, within the meaning of subsection (D)"); *In re R.H.*, No. 10-17-00054-CV, 2017 WL 4293268, at *5–6 (Tex. App.—Waco Sept. 27, 2017, pet. denied) (mem. op.) (concluding that children were endangered under subsection (D) when they were inside Mother's "disabled vehicle on the railroad tracks—a dangerous situation"); *In re J.J.S.*, No. 04–14–00793–CV, 2015 WL 794012, at *2 (Tex. App.—San Antonio Feb. 25, 2015, no pet.) (concluding that child was endangered under subsection (D) when, among other dangerous conditions, he was placed inside stolen vehicle where drugs were present). Because Section 161.001 requires proof of only one statutory predicate ground to support termination, *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not consider whether the evidence is sufficient to prove that Father and Mother endangered the children under Subsection (E), *see* Tex. R. App. P. 47.1.

14

In the concurring opinion, Justice Theofanis argues that we should review both (D) and (E) grounds in this case. We disagree. She first argues that by reviewing the (E) findings, we would be ensuring the parents receive a meaningful appeal by "precluding potential collateral consequences of an unreviewed endangerment finding in the context of a future case concerning another child." However, Paragraph (M) of Section 161.001(b)(1) provides that a court may order termination of parental rights if it finds by clear and convincing evidence that the parent "had his or her parent-child relationship terminated with respect to another child based on **a** finding that the parent's conduct was in violation of Paragraph (D) **or** (E) or substantially equivalent provisions of the law of another state." Tex. Fam. Code § 161.001(b)(1)(M) (emphases added). Thus, either a (D) or (E) finding can have significant collateral consequences on parental rights in future termination proceedings, as the Texas Supreme Court has explained:

> [W]hen parental rights have been terminated under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children. Because only one ground is required to terminate parental rights—and therefore a section 161.001(b)(1)(M) ground based on a prior termination would be sufficient to terminate parental rights to another child in another termination proceeding—the collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E) are significant.

*In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019).

However, those collateral consequences are identical whether there is a (D) finding alone, an (E) finding alone, or both a (D) and an (E) finding. If we were to conclude in this case that the evidence was insufficient under (E), that would not lessen the collateral consequences for the parents. The parents would still be subject to termination of their future parental rights under (M) because of our affirmance of the endangerment finding under (D). And if we were to conclude that the evidence was sufficient under both (D) and (E), that would not

15

increase the collateral consequences for the parents. The affirmed endangerment finding under (D) is enough, by itself, to trigger the application of (M) in future termination proceedings, regardless of what we might decide as to the additional endangerment finding. Accordingly, this Court has on numerous occasions affirmed one endangerment finding under either (D) or (E) without addressing the other endangerment finding, even in cases where the other finding is challenged on appeal. *See, e.g.*, *S.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00476-CV, 2023 WL 402206, at *5 (Tex. App.—Austin Jan. 26, 2023, no pet. h.) (mem. op.) (addressing (E) but not (D)); *E.F.-B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00443-CV, 2022 WL 17478423, at *3 (Tex. App.—Austin Dec. 7, 2022, no pet.) (mem. op.) (affirming endangerment finding on unchallenged (D) ground even though parent challenged (E) ground); *J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 WL 5456653, at *4, *7-*8 & n.5 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.) (addressing (E) but not (D)); *C.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00164-CV, 2021 WL 3073263, at *4 (Tex. App.—Austin July 21, 2021, no pet.) (mem. op.) (same); *J.T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00070-CV, 2021 WL 2672055, at *9 (Tex. App.—Austin June 30, 2021, no pet.) (mem. op.) (addressing (D) but not (E)); *T.A.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00364-CV, 2021 WL 81866, at *3-*4 (Tex. App.—Austin Jan. 8, 2021, pet. denied) (mem. op.) (same); *D.N.-B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00092-CV, 2020 WL 4462327, at *1, *2 (Tex. App.—Austin July 24, 2020, pet. denied) (mem. op.) (same); *C.W. v. Texas Department of Family & Protective Servs.*, No. 03-19-00654-CV, 2020 WL 828673, at *2 (Tex. App.—Austin Feb. 20, 2020, no pet.) (mem. op.) (affirming on unchallenged (E) ground even

though parent challenged (D) ground); *A.C.*, 577 S.W.3d at 698-700 (addressing (E) but not (D)). We see no reason to depart from that procedure here.

Justice Theofanis also contends that addressing both (D) and (E) is in the children's best interest because it "ensures the most expeditious path to the final resolution of the case." While that might be true in some cases, it is not true here. In this case, the Department presented a novel legal theory for endangerment under (E), that one DWI was essentially three DWIs because the parents got into their vehicle on three separate occasions during their trip that day. By limiting our analysis to (D), which presented a more straightforward legal theory of endangerment, we expedited the disposition of this appeal while at the same time ensuring that the parents' due-process rights were protected by reviewing one of the two endangerment findings, either one of which was sufficient, on its own, to subject the parents to collateral consequences under (M). *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.")

We overrule Father's first issue and Mother's first and second issues.

**Best interest**

In Father's second issue and Mother's third issue, they argue that the evidence is insufficient to support the district court's finding that termination of their parental rights was in the best interest of the children.

### *Applicable law*

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's

17

emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d at 807; *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

### *Evidence presented*

CPS conservatorship supervisor Sarah Wardlow was assigned to this case. Wardlow testified that the children had been removed from their parents' care because of the collision that had resulted in Mother and Daughter 2 being "launched from the vehicle" and suffering substantial injuries. Wardlow explained that because Father had been intoxicated and was using drugs at the time of the collision, the Department did not believe that the children were safe in Father's and Mother's care. In Wardlow's view, the parents had been driving with their children under the influence and without car seats "on three separate occasions" that day:

18

(1) from their home to Grandmother's house; (2) from Grandmother's house to the flea market; and (3) from the flea market to where the collision had occurred. Wardlow opined, "If that action is completed three times in one day, it would appear to be a pattern of behavior for them." She added, "[T]hey almost killed one of their children and the Department would not like them to have the opportunity to kill the other remaining children."

Wardlow testified that the Department was also concerned because of Father's and Mother's prior DWI convictions. In the 2017 incident that had resulted in Father's prior DWI conviction, he had a similar blood alcohol level of .224, and in the 2018 incident that had resulted in Mother's DWI conviction, she was pregnant with Daughter 2. Regarding Father, Wardlow testified, "So his behavior showed no indication of change or remorse despite a prior DWI charge. He was released from probation and immediately began drinking again leading to an intoxication assault charge with the same exact blood alcohol level." Regarding Mother, Wardlow testified, "[Mother] shows no protective capacity, her husband at a .224 would have shown signs of intoxication and she made multiple statements of being aware that he was consuming alcohol and yet still chose to put herself and her child in the truck unsecured and drive home with him that day."

Wardlow recounted that at the beginning of the case, Daughter 1 and Daughter 2 were "significantly delayed" in their speech and "mainly grunted." This was a particular concern for Daughter 1, who was four years old at the time and "should have been speaking in sentences." Nicole Bowker, a mental health therapist, performed a child and adolescent needs and strength (CANS) assessment on Daughter 1 and concluded that she was "struggling with adjustment disorder with depressed mood and speech issues" and "may benefit from speech therapy."

19

Wardlow also testified that when the case began, the children were placed with Grandmother. The Department completed a home study on Grandmother's house, but the house was not approved because of safety hazards, lack of transportation, and other concerns. The children were then removed from Grandmother's care and placed with a foster family.

Wardlow acknowledged that the children were bonded to Father and Mother, but she believed that it was in the children's best interest for Father's and Mother's parental rights to be terminated because the Department "ha[d] not seen any substantial changes from either parent as far as engagement and taking their sobriety seriously," despite their having received "prior services through their probation courses" on the dangers of drinking and driving. Wardlow opined, "[G]iven the ages of these three children and their current needs, we do not feel that it would be safe or appropriate to rejoin them to either parent." She added that she did not believe Father and Mother "exercise appropriate protective capacity judgment in order to care for these children long-term." Wardlow also testified that the children's physical, medical, educational, and emotional needs were being met in their foster home, and the Department did not have any concerns that the foster parents would be unable to meet the children's needs in the future.

Kristine Spillers, Court Appointed Special Advocate (CASA) for the children, testified that she had observed the children both in Grandmother's care and in foster care. She testified that the foster parents were meeting the children's emotional, physical, and educational needs and that the children were learning how to speak and read while in their care, which Spillers had not observed the children do while in Grandmother's care. She acknowledged, however, that the children were bonded with Grandmother.

CASA supervisor Jill Rodriguez provided similar testimony. Rodriguez testified that when she and Spillers observed the children in Grandmother's house, "there was really no

20

communication," "the kids [were] not communicating with each other," and Daughter 1 was "drinking a bottle at four years old," which Rodriguez described as a "child development issue" and a "dental issue." Rodriguez added that Daughter 2 also had dental issues that needed to be addressed. Rodriguez believed that the foster parents were able to care for the physical and emotional well-being of the children. She explained, "They have been absolutely adamant in these kids getting their services going, they take them to the doctors, they got [Daughter 2's] teeth fixed, they got her in speech therapy. . . . They've done everything to help these children develop and thrive." Rodriguez testified that CASA did not believe that Father and Mother had "made changes in order to protect their children and to help their children thrive" and was therefore "requesting that the children be adopted by the foster family."

At the time of trial, the children had been placed with their foster family for one year. The children's foster father, D.V. (Foster Father), testified that he owned two businesses and that his wife S.V. (Foster Mother), was a Spanish teacher. They were both fluent in Spanish. Foster Father and Foster Mother have a seven-year-old biological daughter who is bonded to the children and "loves being an older sister." They have fostered three sets of three siblings, including the three children in this case. Foster Father testified that the first two sets of siblings were no longer living with them, as they had been returned to their biological families, and that he and his wife wanted to adopt these children. Foster Father testified that he and his wife "want[ed] to present them with as much opportunity and different things in life" as possible, "whether it's traveling or teaching or, you know, try[ing] to find their gift and what they're gonna do in the future." He explained that as parents, they were "trying to guide them and let[] them flourish" and that he and his wife would do "anything to support that." He added, "We

21

love them very much and we just want the best for them and we pray about it all the time for all the foster kids. We just want them to be safe whether they're with us or someone else."

Foster Mother testified that her biological daughter loved the children and that the children loved her biological daughter. They loved playing together. Foster Mother also testified that she loved the children as if they were her own and that the children were bonded with her. She explained that when the children first came into their care, the children's vocabulary was extremely limited but that it had improved significantly in the year that the children had lived with them. Foster Mother testified that she and her husband wanted to adopt the children and wanted the same thing for them that they wanted for their biological daughter, "that they just feel love, feel safe, feel understood, just like any of us, have friends, get to live a happy life, do the things they love," "have relationships in the future," and "get the same opportunities that each of us have had in life."

Father testified that he works in construction, specifically in masonry. Mother works with him and assists him with translation. Father agreed that he had a drinking problem and had attended Alcoholics Anonymous meetings in the past. Father testified that the last time he had a drink was on the day of the collision and that since that time, he had not tested positive for drugs or alcohol. He had been seeing a therapist to treat his alcoholism but could not complete the therapy because it interfered with his work. Father had been prohibited from seeing the children and had not seen them since Christmas 2021, but he testified that he believed the children would be "better" if they were with him and Mother "because nobody would love them the way we do."

Mother similarly testified that she loved the children and that "no one's [going to] be able to love them the way [she] loves them." Mother also testified that she believed that she

could provide a safe home for the children "that is well-equipped for the children to live there." Mother and Father had recently moved from Kyle to Somerville. Mother's plan was "to send [Daughter 1] and [Daughter 2] to school and register [Son] at the daycare." Mother testified that she would continue working with Father in his masonry business, where she helped him with translation and bookkeeping, and Grandmother would take care of the children while they were working. Mother testified that if Father's rights were terminated but hers were not, her plan was "for him to move out of the house" while continuing to provide for them financially. Mother agreed that Father had a drinking problem and believed that he drank too much.

Vanessa Saucedo provided counseling services to Mother. Saucedo testified that Mother's goal during the counseling sessions "was to focus on parenting and positive parenting." Saucedo believed that Mother had made progress during the approximately four months that she worked with her and that Mother "talked a lot about wanting her kids back and wanting to be a better parent." However, Saucedo acknowledged on cross-examination that Mother "miss[ed] quite a few" counseling sessions.

Department technician Magali Damarrita had supervised Mother's visits with the children. Damarrita testified that she observed that Mother was bonded with the children and that the children were bonded with her. Mother was "focused on the kids" during the visits, brought them clothing and food, and never missed a visit.

Grandmother testified that Father and Mother had "changed very much" since the case began because they wanted their children back. When asked how they had changed, Grandmother testified, "Well, they have progressed a little bit more, they've done other work for themselves so that they can provide for the future." Father had "changed a lot" and Mother was "applying herself" because "she wants to recover her children."

23

Jean McMillan, a licensed professional counselor hired by Mother's lawyer to review the case, testified that she "would endorse the children being returned to the mother, apart from the father and would endorse the maternal grandmother becoming part of the household where the children would potentially reside to help the mother raise the children." At the same time, McMillan would not terminate Father's parental rights but "would put very strong restrictions on the father's access to his children going forward," including that he "never drive them" anywhere and "not be left alone with them." McMillan acknowledged that "great harm" had been done to Daughter 2 and that "the catalyst for this harm was the lack of a child seat." However, McMillan believed "that's been mitigated based on the education that mother's received and her motivation to behave differently going forward for her children." McMillan also believed that it would be "incredibly harmful" for the children not to be with Father and Mother "because they've already created a bond with their biological parents and extended family." On cross-examination, McMillan acknowledged that she had not spoken with Father and that she had spoken with Mother for only a "couple of hours probably."

*Analysis*

The record contains evidence both supporting and contrary to the district court's finding that termination of Father's and Mother's parental rights was in the best interest of the children. The evidence supporting the finding included: (1) the evidence of endangerment summarized above, in which the children were placed unrestrained in Father's vehicle when he was driving while intoxicated, resulting in serious injuries to Daughter 2; (2) Father's and Mother's history of driving while intoxicated, which suggests that this is a "pattern of behavior" for them that could be repeated in the future, causing additional danger to the children; (3) the

24

children had been placed with a loving foster family who wanted to adopt the children; (4) multiple witnesses testified that the children's vocabulary was extremely limited when the case began but that it had improved significantly in the year that the children had lived with their foster family; (5) Daughter 1 had developmental issues and special needs that were being addressed by the foster family; (6) Father's and Mother's proposed placement for the children while Father and Mother were working was with Grandmother, whose home was rejected by the Department because of safety hazards, transportation issues, and other concerns; (7) Father had a drinking problem and, although he had attended Alcoholics Anonymous meetings and therapy in the past, had been unable to complete therapy because it interfered with his work; (8) multiple witnesses testified that the children's physical, medical, educational, and emotional needs were being met in their foster home; and (9) the children loved their foster family.

The evidence contrary to the district court's finding included: (1) the children were bonded to Father, Mother, and Grandmother; (2) Father, Mother, and Grandmother loved the children; (3) Father had made some efforts to address his drinking problem; (4) Mother had attended all of the visits with the children, and the visits went well; (5) Father and Mother had their own business and had stable housing; (6) Grandmother's testimony that Father and Mother had "changed very much" since the case began; and (7) McMillan's testimony that the children should be returned to Mother because she had been "educated" regarding the harm caused to Daughter 2 from "the lack of a child seat" and that Father's parental rights should be restricted but not terminated.

Viewing the above evidence in the light most favorable to the district court's finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Father's and Mother's parental rights was in the best interest of the children.

25

Accordingly, the evidence is legally sufficient to support the best-interest finding. Similarly, we are unable to say that the evidence contrary to the finding is "so significant that the factfinder could not have formed a firm belief or conviction" that termination of Father's and Mother's parental rights was in the best interest of the children. Accordingly, the evidence is also factually sufficient to support the finding.

We overrule Father's second issue and Mother's third issue.

## CONCLUSION

We affirm the district court's order of termination.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis
  Concurring Opinion by Justice Theofanis

Affirmed

Filed: April 13, 2023